## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADAM MORRIS, ARTHUR BURKLE, DENISE GRAHAM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  – against –<br><br>PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, D/B/A FEDLOAN SERVICING, D/B/A AMERICAN EDUCATION SERVICES,<br><br>      Defendant. | Civil Action No. _____<br><br>**COMPLAINT -- CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Adam Morris, Arthur Burkle, and Denise Graham (collectively, "Plaintiffs"), individually and on behalf of those similarly situated, bring this class action against Defendant Pennsylvania Higher Education Assistance Agency (d/b/a FedLoan Servicing and d/b/a American Education Services) ("PHEAA" or "Defendant") for its violations of law from at least as early as June 1, 2009 through the present ("Class Period"), and upon knowledge, the investigation of counsel, and information and belief, allege as follows:

### NATURE OF THE ACTION

1. Student loan debt is now the largest category of non-housing related consumer debt in the United States with more than $1.34 trillion outstanding at the end of June 2017. The overwhelming majority of student loans in the United States are owned by the federal government through the U.S. Department of Education ("DOE" or the "Department of Education").

2. Since June 2009, PHEAA has served as one of four primary servicers of federal student loan debt. PHEAA's loan servicing business operates as FedLoan Servicing ("FedLoan") and manages a loan portfolio worth approximately $330 billion.

3. The Department of Education pays PHEAA an average monthly fee of $2.09 for each of the approximately 7.5 million unique borrowers PHEAA services. PHEAA also earns interest on student loans in its portfolio, in addition to receiving subsidies and special allowance payments from the Department of Education.

4. In exchange, PHEAA acts as a middleman between the Department of Education and the borrowers of federally-owned loans. PHEAA is responsible for not only collecting loan payments, but also offering payment plans and administering federal programs designed to help borrowers effectively manage the increasing cost of higher education. This includes several Alternative Loan Repayment Programs ("ALRPs"), which provide qualifying borrowers with relief from student loan debt by adjusting their payments to a reasonably affordable amount based on their income, occupation, and family size. Borrowers enrolled in an ALRP can also apply to have their federal loans forgiven after a certain number of payments and/or meeting other criteria.

5. In February 2012, the Department of Education made PHEAA solely responsible for administering two ALRPs: the Public Service Loan Forgiveness ("PSLF") program and the Teacher Education Assistance for College and Higher Education ("TEACH") grant program.

6. Congress specifically designed the PSLF and TEACH programs to make higher education more affordable for public servants by providing financial assistance to reduce the burden of their student loans. This included complete forgiveness of federal student debt for borrowers who committed to ten years of qualifying public service employment.

7. These loan programs benefited borrowers (and America) by making higher education more affordable for those who want to serve the public. However, helping borrowers get out of debt sooner directly conflicted with PHEAA's own financial interest in keeping loans active for as long as possible to continue collecting monthly servicing fees.

8.      So, PHEAA implemented a scheme during the Class Period to boost revenue by extending the duration of loans in its portfolio through at least three unlawful means:

9.      First, PHEAA delayed or failed to process applications under the PSLF and TEACH programs. Because loan payments only count towards forgiveness once a borrower's application is processed, this extended the duration of loans in the PSLF and TEACH programs, allowing PHEAA to collect more in monthly servicing fees. This misconduct directly injured borrowers who were required to make additional payments on loans that otherwise would have been forgiven.

10.     Second, PHEAA delayed or failed to process applications for federal Income Driven Repayment ("IDR") plans, including specifically the new Revised Pay As You Earn ("REPAYE") program created in 2015. These IDR plans allow borrowers to make lower monthly payments based on their income and family size. They also provide for loan forgiveness after at least twenty years of repayment. PHEAA's processing delays prevented borrowers from making qualifying payments toward this twenty-year repayment period, increasing the amount of servicing fees it collected by extending the duration of loans in an IDR plan.

11.     Third, PHEAA improperly placed borrowers making timely loan payments into deferment or forbearance status—a designation typically reserved for situations where the borrower seeks relief from its payment obligations due to financial hardship. Borrowers who are in deferment or forbearance cannot make qualifying payments that count towards loan forgiveness under the PLSF or IDR programs even though PHEAA continues to collect fees for servicing their loans. Thus, PHEAA's abuse of the deferment and forbearance process artificially increased revenue and extended the duration of loans in the PSLF and IDR programs.

12.     Reports published by the Consumer Financial Protection Bureau ("CFPB") describe complaints from borrowers nationwide of identical, widespread misconduct by PHEAA in its exploitation of the PSLF, TEACH, and IDR programs. These unlawful acts not only caused

borrowers to deal with inconvenience and headaches but also to suffer measurable financial harm when: (a) the duration of their loans were extended; (b) interest accrued on the principal balance of loans during unrequested periods of deferment or forbearance; (c) monthly payments under IDR programs were billed at inaccurate levels; and (d) they were charged additional fees due to delay in processing their applications for the PSLF, TEACH, and IDR programs.

13.     PHEAA's comprehensive strategy to increase loan duration and generate greater servicing fees during the Class Period was hugely successful. Financial statements show that PHEAA's revenue from servicing federally-owned student loans has increased each year, a direct result of the unlawful acts alleged in this Complaint.

14.     This increase in revenue comes at the expense of borrowers, like Plaintiffs and the Class, who were subjected to one or more of PHEAA's illegal tactics while their loans were serviced by FedLoan. As a result, Plaintiffs and the Class have either lost out on months or years of qualifying loan payments that would have brought them closer to loan forgiveness under the PSLF, TEACH, and IDR programs; been overcharged; or otherwise disadvantaged when they were unable to utilize federal programs designed to make their education more affordable.

15.     Based on the continuing complaints described by the CFPB and pervasive nature of Defendant's misconduct, Plaintiffs believe that further evidentiary support for their claims, as alleged herein, will be revealed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

16.     This Court has minimal-diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Defendant PHEAA, is a citizen or subject of the Commonwealth of Pennsylvania, while there are Class members (including Plaintiffs) who are citizens of a different State.

17.     This Court has general personal jurisdiction over PHEAA because PHEAA is incorporated in and has its principal place of business in Pennsylvania.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period the Defendant resided, transacted business, was found, or had agents in the Eastern District of Pennsylvania, including from an office in Chester, Pennsylvania.

## PARTIES

### I.     Plaintiffs

#### a.  Plaintiff Adam Morris

19.     Plaintiff Adam Morris ("Morris") is a natural person who resides in Cumberland County, Pennsylvania. Plaintiff Morris borrowed federal student loans to pay for his undergraduate and graduate school education. Following graduation, Plaintiff Morris entered qualifying employment for the Commonwealth of Pennsylvania and enrolled in the PSLF program. He also contemporaneously entered an IDR plan. FedLoan is currently Plaintiff Morris' loan servicer.

20.     FedLoan informed Plaintiff Morris in 2016 that certain of his federal student loan payments would not qualify for forgiveness under the PSLF program. This was the first time FedLoan had raised this issue, despite receiving and processing at least four years of PSLF recertification forms and payments related to those exact loans.

21.     Plaintiff Morris subsequently needed to borrow additional money from the Department of Education years after graduation to consolidate these loans into one that could qualify for forgiveness under the PSLF program.

22.     Defendant PHEAA's failure to correctly process Plaintiff Morris' PSLF recertification forms resulted in a loss of credit for what otherwise would have been four years of qualified payments under the PSLF program, thereby significantly extending the duration of his student loans.

23.     Defendant PHEAA also unnecessarily placed Plaintiff Morris' loans into deferment or forbearance status each year when he followed Department of Education guidelines and reapplied for a new IDR plan that reflected his current income and family status.

24.     Plaintiff Morris never applied for or asked PHEAA to place his loans into deferment or forbearance status when reapplying for an IDR plan. Yet, Plaintiff Morris was unable to make qualifying payments towards loan forgiveness under the PSLF program each time PHEAA placed his loans into deferment or forbearance status. This conduct injured Plaintiff Morris because the inability to make qualifying payments while PHEAA placed his loans into deferment or forbearance status extended the duration of those loans.

25.      Defendant PHEAA also charged Plaintiff Morris additional processing fees each time his loan was placed into or removed from deferment or forbearance status. These fees were illegitimate because Plaintiff Morris did not apply for a deferment or forbearance and represent additional damages caused by Defendant PHEAA's misconduct.

### b.  Plaintiff Arthur Burkle

26.     Plaintiff Arthur Burkle is a natural person and resident of Kings County, New York. Plaintiff Burkle used federal student loans to pay for his graduate school education. FedLoan is currently Plaintiff Burkle's loan servicer. Following graduation, Plaintiff Burkle entered qualifying employment with a tax-exempt non-profit organization in New York and enrolled in the PSLF program. He also contemporaneously enrolled in an IDR plan and subsequently joined the REPAYE program.

27.     PHEAA misprocessed Plaintiff Burkle's PSLF and REPAYE applications. Specifically, PHEAA miscalculated Plaintiff Burkle's monthly payments to be greater than they should have been under the REPAYE program. Plaintiff Burkle relied on PHEAA's calculations and

paid the inflated amount to maintain his eligibility under the REPAYE and PSLF programs. These artificially inflated payments resulted in monetary loss to Plaintiff Burkle.

28.     Plaintiff Burkle was also harmed by Fed Loan's failure to correctly process his loan payments. For example, in December 2017, Plaintiff Burkle submitted a timely loan payment and received a confirmation notice from FedLoan indicating that it had received this payment on time.

29.     Despite receiving this confirmation, Plaintiff Burkle received a subsequent notice from FedLoan that his payment was not accepted. Plaintiff Burkle promptly resubmitted this payment. However, FedLoan had already erroneously marked his account as "past due." As a result, Plaintiff Burkle is at risk of losing credit for submitting timely, qualifying payments under the REPAYE and PSLF programs, extending the duration of his loans due to PHEAA's failure to correctly process his loan payments.

### c.  Plaintiff Denise Graham

30.     Plaintiff Denise Graham is a natural person and resident of Fairfield County, Connecticut. Plaintiff Graham used federal student loans to pay for college and graduate school education. FedLoan is currently Plaintiff Graham's loan servicer.

31.     Following graduation, Plaintiff Graham enrolled in an IDR plan through FedLoan. Defendant PHEAA misprocessed this application and incorrectly calculated Plaintiff Graham's student loan payments under that federal program. As a result, Plaintiff Graham is at risk of losing credit for qualifying payments under the IDR program, extending the duration of her loans.

### II.  Defendant

32.     Defendant PHEAA is incorporated under the laws of the Commonwealth of Pennsylvania, 24 P.S. § 5101 and headquartered at 1200 North 7th Street, Harrisburg, Pennsylvania 17102. PHEAA was originally formed by the Pennsylvania General Assembly in 1963 as a public corporation with the goal of improving higher education opportunities for Pennsylvania residents by

funding student loans and grants. Since then, PHEAA has drastically changed its Commonwealth-focused business model into a national student loan servicer.

33.      In 2009, PHEAA became one of four "Title IV" servicers to be awarded a Federal Loan Servicing Contract by the Department of Education. PHEAA operates a national loan servicing, lending, and guaranteeing business under two trade names: FedLoan, which exclusively handles federally-owned student debt, and American Education Services. These businesses collectively generate hundreds of millions of dollars in revenue each year. For example, in 2014, PHEAA's revenues exceeded $600 million, with net revenues of more than $220 million, and owned net assets worth more than $700 million.

34.      PHEAA is financially independent from the Commonwealth of Pennsylvania and operates as a private business. In fact, PHEAA's revenues are such that it has received no public appropriations to support its operations since 1988. PHEAA also has the power to sue and be sued; enter into contracts; and own, encumber, and dispose of real and personal property. Further, under Pennsylvania law, PHEAA bears sole responsibility for its bonds and other debts and is authorized to pursue student-loan collection actions independently. These facts have led courts to find that PHEAA is "a very wealthy corporation engaging in nationwide commercial student-loan financial-services activities" and not an arm-of-the-state.[1]

---

[1] *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 676–77 (4th Cir. 2015), *cert. denied*, 137 S. Ct. 617, 196 L. Ed. 2d 513 (2017); *see also Pennsylvania Higher Educ. Assistance Agency v. NC Owners, LLC*, No. 1:16-CV-1826, 2017 WL 2506397, at *2 (M.D. Pa. June 9, 2017); *Lang v. Pennsylvania Higher Educ. Assistance Agency*, 610 F. App'x 158, 160–63 (3d Cir. 2015); *Lang v. Pennsylvania Higher Education Assistance Agency*, 201 F. Supp. 3d 613 (M.D. Pa. 2016).

## SUBSTANTIVE ALLEGATIONS

   I.   **Background**

        A.  **Student Loan Debt**

35.     The average annual cost of higher education in the United States has increased at a significantly greater rate than inflation for several decades. For example, a recent study by the College Board shows that the inflation-adjusted cost of attending a private four-year, public four-year, or public two-year institution has more than tripled since 1970.[2]

36.     Students have increasingly come to rely on student loans to pay for higher education as tuition, fees, and costs increased. Student loan debt is now the largest category of non-housing consumer debt in the United States with $1.34 trillion in loans outstanding as of June 30, 2017.[3]

37.     The overwhelming majority of student loans (approximately 94%) are owned by the federal government. The Department of Education primarily relies on four loan servicing companies to assist in managing this debt: (1) PHEAA; (2) Great Lakes Higher Education Corporation; (3) NelNet; and (4) Navient. According to data from the National Student Loan Data System ("NSLDS"), PHEAA was the largest servicer of federally-owned student loans in the United States as of September 30, 2016.

38.     Loan servicers who are engaged by the Department of Education are assigned loans taken out by student borrowers when the loans are disbursed (*i.e.* funds are paid out to the student to spend on tuition, housing, or supplies). Once the loan servicer is assigned a loan, it steps in for the federal government to perform all tasks associated with loan repayment, such as collecting payments, responding to customer service inquiries, providing loan documents to borrowers,

---

[2] *Tuition and Fees and Room and Board over Time*, Table 2, (Released 2017), The CollegeBoard
https://trends.collegeboard.org/college-pricing/figures-tables/tuition-fees-room-and-board-over-time.

[3] *Quarterly Report on Household Debt and Credit*, 2017:Q2 (Released August 2017), Federal Reserve Bank of New York
https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf
/HHDC_2017Q2.pdf

enrolling borrowers in federal loan repayment programs, handling applications for loan deferment or forbearance status based on financial hardship, advising borrowers on their repayment plan options, and performing other administrative tasks. Borrowers are assigned their loan servicer and cannot apply to switch to another loan servicer.

39.     The servicer receives a per-unit fee from the Department of Education for each loan that it administers. That fee depends on the status of the loan and the total volume of loans from the category being serviced. For example, PHEAA's fee schedule in its 2009 loan servicing agreement with the Department of Education is represented in the table below. This table includes a "unit price," or monthly payment due to PHEAA,[4] for loans in 7 different status categories, including "in-school status," "grace or current repayment status," "deferment or forbearance," and varying durations of delinquency:

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in in-school status | N/A | N/A | $ 1.050 |
| Borrowers in grace or current repayment status | 1 | 3,000,000 | $ 2.110 |
|  | 3,000,001 | UP | $ 1.900 |
| Borrowers in deferment or forbearance | 1 | 1,600,000 | $ 2.070 |
|  | 1,600,000 | UP | $ 1.730 |
| Borrowers 31-90 days delinquent | N/A | N/A | $ 1.620 |
| Borrowers 91-150 days delinquent | N/A | N/A | $ 1.500 |
| Borrowers 151-270 days delinquent | N/A | N/A | $ 1.370 |
| Borrowers 270+ days delinquent | N/A | N/A | $ 0.500 |

**FIGURE 1**

40.     As illustrated in Figure 1 above, PHEAA is compensated on a "per unit" basis, with a directly proportional relationship between revenue and the number of borrowers that maintain an active loan balance.

---

[4] A recent annual financial statement, released in August 2016, states that PHEAA received $188.5 million for servicing a portfolio of 7.5 million student loan borrowers in their Federal Loan Servicing (FLS) portfolio. This corresponds to an average of roughly $2.09 per month for each borrower.

41.     This fee structure gives PHEAA a financial incentive to maintain or increase the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans.

### B.  Alternative Loan Repayment Programs

42.     One primary responsibility of loan servicers is to provide information about and enroll borrowers in various federal loan repayment plans.

43.     The most common student loan repayment plan is the Level Repayment Plan, which breaks the borrower's obligation under the loan into equal monthly payments. However, the federal government has created several Alternative Loan Repayment Programs ("ALRPs") to mitigate the burden on borrowers.

44.     Though there are differences between ALRPs, they all have material factors in common. For example, each ALRP requires the borrower to apply with the borrower's loan servicer by reporting their income, location, and other information, which the loan servicer is supposed to use to process the application.

45.     Each ALRP also requires borrowers to make "qualifying monthly payments" in order to qualify for loan forgiveness at the end of the term. For example, under the PSLF program, a qualifying monthly payment is a payment made: (a) after October 1, 2007; (b) under a "qualifying repayment plan," including all Income Driven Repayment plans; (c) for the full amount due as shown on the bill; (d) no later than 15 days after the due date; and (e) while employed by a "qualifying employer."[5]

46.     Qualifying payments can only be made while the borrower is required to make a payment. Therefore, a borrower cannot make qualifying payments while: (a) they are still in school;

---

[5] https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-payment.

(b) they are in the "grace period" before repayment starts (typically six months after graduation); (c)

their loans are in either deferment or (d) forbearance status.

47.     Additionally, the overarching goal of each ALRP program, and the loan servicer's

role in administering the program, is to provide graduates with an opportunity to select a repayment

program that is reasonably affordable based on the borrower's income and occupation.

### 1.   IDR Programs

48.     One group of ALRPs the Department of Education authorizes is known as Income

Driven Repayment or "IDR" plans. IDR plans set the borrower's monthly student loan payments at

an amount that is intended to be affordable based on his or her income and family size. [6]

49.     As of June 2016, nearly 5.3 million borrowers were enrolled in IDR plans.[7]

50.     IDRs allow borrowers to cap their loan payments at 10 percent of their income and

forgive any remaining debt after 20 years of payments.

51.     However, as with the PSLF Program described below, borrowers do not receive

credit for loan forgiveness in months where they are dis-enrolled, such as when their loans are in

deferment or forbearance, or their application is being processed by the loan servicer.

52.     To enroll in an IDR plan, borrowers are required to submit an application, along

with proof of income and family size, to their loan servicer for review and processing. This

application may be submitted online or via a paper application sent to the loan servicer. Either way,

loan servicers are supposed to process the application within 15 days.[8]

---

[6] https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[7] *Department of Education Releases New Public Service Loan Forgiveness Application Data*, Department of Education (Aug. 22, 2016) https://www.ed.gov/news/press-releases/department-education-releases-new-public-service-loan-forgiveness-application-data.

[8] *See U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on Policy Direction on Federal Student Loan Servicing* (July 20, 2016), available at http://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

53.     The Revised Pay As You Earn Repayment Plan ("REPAYE Plan") is the most recent IDR program added by the Department of Education. This program is designed to allow a borrower to cap their monthly payments based on their income. All Direct Loan, Stafford, and Graduate PLUS borrowers are eligible for REPAYE.

54.     Under REPAYE, a borrower's payments are capped at 10 percent of their discretionary income. Discretionary income is calculated by subtracting 150 percent of the state poverty guideline for the borrower's family size from the borrower's gross after-tax income.

55.     Under REPAYE, balances for undergraduate degree loans are forgiven after a borrower makes 20 years of eligible payments. Balances for graduate and professional degrees, or a combination of graduate and undergraduate degrees, are forgiven after 25 years of eligible payments.

56.     Under REPAYE, if a borrower's monthly payment does not cover all the interest owed each month, the REPAYE plan covers half of the unpaid interest. For those borrowers under subsidized loans, the REPAYE plan covers all unpaid interest for first three years of the enrollment and half of the unpaid interest thereafter.

57.     If a borrower leaves the REPAYE program, the unpaid interest will be added to the borrower's principal.

58.     In conjunction with the PSLF program, REPAYE payments count toward the 120 qualifying payments required for PSLF.

2.     PSLF Program

59.     The PSLF program is an ALRP specifically designed to help make higher education more affordable for those who work in public service. Borrowers who enroll in the PSLF Program are entitled to loan forgiveness in as little as half the time as those enrolled in a standard IDR Program. The PSLF Program allows borrowers who are employed in public service and make 10

13

years of qualifying payments, *i.e.* 120 total monthly payments, under an IDR Program to earn forgiveness of the remaining balance on their student loans.

60.     The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by offering a faster route to loan forgiveness, partially offsetting the fact that public service employment typically offers a lower salary than private sector employment.

61.     In addition to making 120 payments, borrowers in the PSLF Program must be employed full-time in "qualifying employment." Qualifying employment is employment in government organizations at any level (federal, state, local, or tribal), tax-exempt not-for-profit organizations, and other not-for-profit organizations that deliver qualifying public services (*e.g.*, military service, law enforcement, public safety, public health, education, and legal services).

62.     Many students who aspire to work in public service organizations take out student loans and pursue careers in the public interest because they have been promised early loan forgiveness under programs such as the PSLF Program.

### 3.   TEACH Grant Program

63.     The TEACH program is a separate ALRP that provides monetary grants to students who are completing or plan to complete coursework needed to begin a career in teaching and agree to teach in a high need field (*e.g.*, math, science, or foreign languages) at a school or educational service agency that serves students from low-income families for at least four years.

64.     Certain TEACH Grant recipients are also eligible for loan forgiveness under the PSLF program because teaching can be a qualifying employment under that program.

65.     All TEACH Grant funds received by borrowers who do not meet the service obligations are converted to a Direct Unsubsidized Loan, with interest charged from the original date the Teach Grant was disbursed.[9]

## II.     PHEAA is Incentivized to Extend the Duration of Borrowers' Loans

66.     In 2009, PHEAA was one of four "Title IV" servicers to be awarded a Federal Loan Servicing Contract by the Department of Education to service federally-owned loans nationally. The Department of Education's contract with PHEAA provides: "[i]t is the intent of the Department to procure a performance-based contract(s) that promotes competition and provides best of business services. To achieve this goal, the Department expects each servicer to provide commercially available services that will yield high performing portfolios and high levels of customer satisfaction."

67.     As one of the Department of Education's primary loan servicers, PHEAA acts as a middle man between the student loan borrower and the lender—the federal government. In this capacity, PHEAA is responsible not only for collecting and processing student loan payments but also for providing other services, such as offering repayment plans and loan consolidation.

68.     PHEAA is also responsible for implementing several government programs related to student loan forgiveness. In 2012, the Department of Education awarded PHEAA an exclusive contract to manage both the PSLF Program and the TEACH Grant Program through FedLoan. PHEAA's responsibilities under the PSLF and TEACH grant programs include collecting application paperwork, processing applications, and communicating with borrowers to ensure that applications are complete.

69.     This contract created a conflict of interest between PHEAA and the borrowers whose loans it was supposed to service. While borrowers enroll in ALRPs to earn loan forgiveness

---

[9] *Teach Grant Program*, Department of Education (Feb. 2017) https://studentaid.ed.gov/sa/sites/default/files/teach-grant.pdf.

and maintain affordable monthly loan payments, PHEAA has the opposite incentive: to keep loans active for as long as possible to continue earning servicing fees.

70.     From PHEAA's perspective, every time a student borrower repays her loan in full or receives loan forgiveness under one of the federal programs it administers, PHEAA loses a loan from its servicer portfolio, a vital source of its revenue.

71.     PHEAA's 2009 contract with the federal government also created a financial incentive to place borrowers into deferment or forbearance status to further increase servicing fees. For example, Figure 1 shows that the unit price PHEAA is compensated for servicing each loan depends on its status (*e.g.*, current repayment, deferment, or forbearance) and the total number of loans in its portfolio that are part of the same category.

72.     Under PHEAA's 2009 contract, once the total amount of loans in active repayment or grace period status exceeded 3,000,001, PHEAA received a *lower* unit price per loan than it did for loans in deferment or forbearance. Thus, once the 3,000,001-loan threshold was reached, each loan PHEAA moved from active repayment or grace period status into deferment or forbearance generated additional revenue even though it prevented borrowers from making qualified payments.

73.     The Department of Education subsequently revised its contract with PHEAA in 2014 to remove this incentive by lowing the amount it paid for loans in deferment or forbearance to below that of loans in active repayment.[10] However, it maintained the same overall structure of compensating PHEAA based on the number of loans in its portfolio, continuing to motivate PHEAA to ensure that borrowers remained in debt as long as possible.

74.     Multiple data sources confirm that PHEAA enacted policies that align with its own financial incentives, rather than the interests of borrowers it is supposed to serve. For example, the

---

[10] *See* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/ED-FSA-09-D-0014_MOD_0072_PHEAA.pdf

federal government performs an evaluation each quarter to measure the performance of each of the ten major loan servicers using a formula that factors in criteria, such as the "percentage of borrowers in current repayment status," the percentage of loans that have fallen into delinquency, and borrower satisfaction with customer service.

75.    In the evaluation covering the period ending December 31, 2016, PHEAA ranked ninth of the ten servicers evaluated. Significantly, PHEAA had the lowest percentage of loans in current repayment status, indicative of preventing borrowers from paying off their loans.

76.    Consistent with this evaluation, the CFPB has received numerous complaints from borrowers whose loans were serviced by FedLoan, depicting a pattern of misconduct intended to prevent loan repayment. For example, in an April 2017 Monthly Complaint Report, the CFPB described that federal student loan borrowers complained of:

(a) difficulty enrolling in income-driven repayment plans, reporting lost documentation, extended application processing times, and unclear guidance when seeking to switch from one income-driven payment plan to another;

(b) difficulty completing recertification for their income-driven repayment plan, including lengthy processing times and insufficient information from their servicers to meet rectification deadlines;

(c) overpayments being misapplied such that, instead of reducing the principal value of the loan, the payment was applied to future balances and placed the loan in "paid ahead status" rather than reducing the overall amount owed; and

(d) failures in administering the PSLF and TEACH grant programs. For example, borrowers complained that delays in processing IDR plan enrollment and recertification blocked them from making qualifying repayments under the PSLF program. Other borrowers reported that they were denied loan forgiveness under the PSLF program or financial assistance under the TEACH grant program based on inaccurate employment data. Additionally, borrowers complained that after years of making payments they were informed that they were not enrolled in the PSLF program (despite having submitted application papers) because some of their loans had been previously consolidated.[11]

---

[11] http://files.consumerfinance.gov/f/documents/201704_cfpb_Monthly-Complaint-Report.pdf.

77.     PHEAA was also the second most complained about student loan servicer in April 2017, experiencing a 269% year-over-year increase in complaints. At all times covered by the CFPB's April 2017 report, PHEAA, through FedLoan, was the exclusive loan servicer for borrowers applying for PSLF loan forgiveness and TEACH grants. Thus, any complaints about the administration of those programs were directed at PHEAA's and FedLoan's practices.

78.     The Massachusetts Attorney General ("AG") also sued PHEAA for similar violations, stating that "PHEAA has positioned itself as a barrier to borrowers' chances of long term financial success" by failing to process applications under the PSLF and TEACH programs, costing borrowers "months that should have counted towards their loan forgiveness causing them to lose financial grants and further saddling them with debt." The Massachusetts AG also noted that its investigation had found that PHEAA was "overcharging and misprocessing their applications for Income Driven Repayment . . . plans that make borrowers' monthly payments more affordable," depriving them of the opportunity to make qualifying payments towards loan forgiveness.[12]

79.     Investigations by the Massachusetts AG, the CFPB, and first-hand accounts from student borrowers, including Plaintiffs, show that PHEAA adopted a policy of prioritizing its own financial best interests at the expense of the student loan borrowers by systematically failing to administer government programs in the way intended by Congress, artificially increasing revenue from servicing fees by keeping borrowers' loans active longer.

### III.     PHEAA has a Policy Designed to Deny Borrowers the Benefits of the Loan Forgiveness Programs in Violation of its Loan Servicing Contract.

80.     PHEAA devised and implemented a scheme during the Class Period to deny borrowers the benefits that Congress and the Department of Education intended for them when it

---

[12] See Complaint, *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency, d/b/a/ FedLoan Servicing*, No. 1784-cv-02682 (Mass. Supp., Aug. 23, 2017).

created the ALRPs. This scheme to deny and delay loan forgiveness was implemented through multiple common practices, including: (a) creating obstacles to repayment; (b) providing incorrect information to borrowers; (c) processing payments incorrectly; (d) failing to act when borrowers complained; and (e) illegally cheating many struggling borrowers out of their rights to lower payments, which caused them to overpay for their student loans.

81.     PHEAA's failure to process ALRP applications timely and properly deprived borrowers of the opportunity to make qualifying monthly payments that count toward loan forgiveness. To accommodate its processing delays, PHEAA puts borrowers' accounts into deferment or forbearance status, which is not a qualifying repayment plan for loan forgiveness under any ALRP. In at least some instances, this deferment or forbearance designation also increased the service fees collected by PHEAA.

82.     For example, many borrowers have reported that PHEAA "lost" their application documents for ALRPs, only notifying them months later that they had not been enrolled in an ALRP for which they were eligible and had properly applied. PHEAA placed these borrowers in forbearance, frustrating borrowers' ability to make loan repayments that count toward loan forgiveness.

83.     In other instances, PHEAA failed to enroll eligible applicants who submitted complete applications in the appropriate ALRP because of unspecified "processing errors."

84.     For example, PHEAA significantly mishandled application processing for the REPAYE plan, the newest ALRP plan, when it became available in December 2015. Its failure to process applications timely and properly resulted in a lengthy application processing backlog that delayed borrowers from staying on track with monthly payments that would count towards loan forgiveness.

85.     These borrowers, including public service employees and low-income borrowers, have therefore lost months that would otherwise count toward achieving loan forgiveness.

86.     One student loan borrower who is eligible for both IDR and PSLF and whose application remained pending for months submitted the following complaint to the CFPB, explaining how delays in processing applications created a financial hardship for her:

> This delay . . . is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public Service Loan Forgiveness program, so the "clock" on my maximum 10-year repayment time span has essentially stopped.[13]

87.     Such delays cost borrowers in many other ways as well. Economic analysis reveals that income grows for workers as they remain in the workforce, peaking at roughly 25 years into their career.[14] For example, borrowers in forbearance forgo qualifying months at their present income and family size and assume an obligation to make future monthly payments at the back end of their loan forgiveness term (*e.g.* after 10 years for PSLF enrollees or 20 to 25 years for IDR enrollees). These borrowers are forced to make higher payments at the end of their loan terms, when they statistically earn a higher salary and the higher monthly loan payment that goes with it. This increases the total lifetime cost of their loans.

88.     Additionally, when PHEAA finally processes applications for ALRPs, it often calculates an incorrect monthly payment.

89.     On multiple occasions, these miscalculations caused borrowers to lose qualifying payment months and erroneously prolonged borrowers' loan repayment obligations.

---

[13] *See* https://www.consumerfinance.gov/about-us/blog/trying-enroll-income-driven-repayment-plan-avoid-applicationabyss-our-student-loan-tips-and-resources.

[14] *See Economic Analysis - Major Decisions: What Graduates Earn Over Their Lifetimes*, Brad Hershbein and Melissa S. Kearney, The Hamilton Project (Sep. 29, 2014), available at http://www.hamiltonproject.org/papers/major_decisions_what_graduates_earn_over_their_lifetimes.

90.     On other occasions, borrowers who submitted their TEACH certification forms have experienced PHEAA's improper delay and refusal to process their required annual recertification. As a result, many teachers who received TEACH grants had their TEACH grants improperly converted into loans, costing them thousands of dollars in new principal amounts and thousands of dollars in interest.

91.     When viewed in the context of PHEAA's contract with the federal government and its own financial incentives, PHEAA's multiple failures reflect more than just gross incompetence. They demonstrate a willful commitment to elevate its own revenues at the expense of the borrowers who make up the Class by denying them credit toward loan forgiveness, placing them in deferment or forbearance unnecessarily, and overcharging them on monthly payments.

### IV.     PHEAA's Unlawful Policy Injured Plaintiffs

92.     Plaintiffs are student loan borrowers whose loans are currently serviced by FedLoan.

93.     Plaintiffs enrolled in at least one ALRP through FedLoan, including the PSLF and IDR programs, during the Class Period.

94.     As alleged herein, PHEAA exploited these programs to increase the duration of Plaintiffs' and Class members' loans and generate additional servicing fees by, among other things: (a) misprocessing ALRP recertification forms; (b) unnecessarily placing borrowers accounts into deferment or forbearance status; and (c) charging additional processing and administration fees to remove borrowers accounts from unrequested deferment or forbearance. *See* ¶¶ 22-34, *supra*.

95.     This misconduct resulted in increased revenue for PHEAA at the expense of Plaintiffs and Class members, who were injured when they lost credit for qualifying loan payments, were charged more than the qualifying monthly payments due under the applicable loan programs, had their ALRP applications misprocessed by PHEAA, and were charged unnecessary and unlawful fees as described in this Complaint.

96.     Significantly, by increasing the duration of Plaintiffs' and Class members' loans, PHEAA caused additional harm by inflating the total amount owed by these borrowers. For example, loans placed into deferment or forbearance status continue to accrue interest even though borrowers are unable to make qualifying loan payments at that time. This additional interest is added to the outstanding loan balance and increases the borrower's debt obligation.

97.     PHEAA's systematic abuse of the federal programs it administers to increase servicing fees has also disadvantaged Plaintiffs by jeopardizing Plaintiffs' ability to seek loan forgiveness in the future based on payments made during the Class Period. This has further extended the duration of Plaintiffs' loans, causing financial harm by obligating Plaintiffs to make additional loan payments.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and as representatives of the following Class:

> All persons whose student loans were serviced by FedLoan that enrolled in an ALRP program during the period of at least January 1, 2009, through the present (the "Class Period").[15]

99.     Excluded from the Class are Defendant, its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the United States Government.

100.    The Class is so numerous and geographically dispersed that joinder is impracticable. Further, the Class is readily identifiable from information and records in the Defendant's possession.

---

[15] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

101.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendant's common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendant's wrongful conduct in violation of the laws as alleged herein.

102.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interests adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation.

103.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

1.  Whether PHEAA has a common and pervasive practice of misprocessing and delaying applications for ALRPs;

2.  Whether PHEAA's misconduct caused injuries to Plaintiffs and the Class by causing them to pay unnecessary interest, fees, and other charges;

3.  Whether PHEAA's misconduct violates state consumer protection statutes;

4.  Whether PHEAA's misconduct violates the common law.

104.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would

23

be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

105.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(For Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq.*)**

106.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

107.    Plaintiff Morris' injuries and those of the Class arise from Defendant's deceptive business practices as a commercial student-loan servicer.

108.    Plaintiff Morris and Class members are consumers of Defendant's federal student loan services; their loans are serviced by Defendant and they applied through Defendant to take advantage of the PSLF, IDR, and TEACH programs that Defendant administers.

109.    As a consumer of Defendant's services, Plaintiff Morris is authorized to bring a private action under Pennsylvania's UTPCPL 73 P.S. § 201-9.2.

110.    Pursuant to Pennsylvania's UTPCPL, 73 P.S. § 201-2(3):

"Trade" and "commerce" mean "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."

111.    Defendant offered the PSLF, IDR, and TEACH programs to Plaintiff Morris and Class members representing to them that it would administer those programs in accordance with

24

Department of Education guidelines and Congress's intent of making higher education more affordable for qualified borrowers, including Plaintiff Morris and the Class.

112.    Contrary to Defendant's representations during the Class Period, Defendant failed to administer the PSLF, IDR, and TEACH programs according to Department of Education guidelines and Congress' intent so that it could increase its profits.

113.    Specifically, Defendant failed to comply with DOE guidelines by, among other things: (a) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that status; (b) failing to process borrower applications for IDR plans, including REPAYE, within the necessary 15-day period; (c) failing to enroll qualifying borrowers that submitted applications into the PSLF, TEACH, and IDR programs; (d) failing to properly calculate borrowers' monthly payments under ALRPs at a level consistent with their income and family size; (e) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in TEACH grants being incorrectly converted into loans.

114.    Defendant's practices, as set forth above, involve trade or commerce because they present information regarding commercial services for the processing of applications and payments under several federal ALRPs. These practices are fraudulent or deceptive because Defendant represents that its services have benefits consistent with DOE guidelines, which it fails to provide.

115.    Plaintiff Morris and Class members relied on Defendant's misrepresentations regarding its practice of administrating the ALRPs in accordance with DOE guidelines.

116.    Additionally, Plaintiff Morris and Class members had no meaningful choice and were required to submit to Defendant's practices because Defendant was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff Morris and Class members were required to stay with Defendant even when it engaged in fraudulent or deceptive

misconduct, for example, preventing them from taking advantage of the PSLF program by placing their loans in unrequested periods of deferment or forbearance.

117.     Defendant's acts cost Plaintiff Morris and the Class ascertainable monetary losses in the form of increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Morris and Class members qualified for loan forgiveness, causing Plaintiff Morris and the Class to incur additional payment obligations before the end of their loan terms.

118.     Defendant's conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

a.   Defendant's fraudulent or deceptive conduct in collecting student loan payments; supplying vague, incorrect, and misleading information; delaying Plaintiffs' and Class members' paperwork; failing to return Plaintiffs and Class members to the correct plan; and utilizing a paperwork and information processing system that is intentionally ineffective and inefficient; and

b.   Defendant's fraudulent or deceptive conduct otherwise implicates consumer protection concerns including, but not limited to, promoting fair and upright business practices.

119.     Defendant's failure to carry out these federal loan programs as advertised created a likelihood of confusion and misunderstanding in violation of the UTPCPL.

120.     Plaintiff Morris and the Class suffered harm as a result of Defendant's fraudulent or deceptive conduct, including having their access to debt relief and loan forgiveness delayed through the loss of qualifying payment months under ALRPs.

121.     Plaintiff Morris and the Class further seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Class will be irreparably harmed unless the unlawful actions of the Defendant are enjoined, as Defendant will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PSLF, TEACH grant and IDR programs. Absent injunctive relief, Defendant will continue to administer loans in a manner that harms consumers and directly conflicts their

representations as serving the best interest of borrowers and the intent of Congress, in accordance

with Department of Education guidelines, as detailed more fully herein

## SECOND CLAIM FOR RELIEF
### (For Violation of Connecticut's Unfair Trade Practices Act
### Conn. Gen. Stat. Ann. § 42-110a *et seq.*)

122.     Plaintiffs reallege and incorporate the preceding allegations of this Complaint with

the same force and effect as if fully restated herein.

123.     Plaintiff Graham's injuries and those of the Class arise from Defendant's deceptive

business practices as a commercial student-loan servicer.

124.     Plaintiff Graham and Class members are consumers of Defendant's federal student

loan services; their loans are serviced by Defendant and they applied through Defendant to take

advantage of the PSLF, IDR, and TEACH programs that Defendant administers.

125.     As a consumer of Defendant's services, Plaintiff Graham is authorized to bring a

private action under CUTPA, Conn. Gen. Stat. Ann. § 42-110g.

126.     Pursuant to CUTPA, Conn. Gen. Stat. Ann. § 42-110a:

"Trade" and "commerce" means the advertising, the sale or rent or lease, the
offering for sale or rent or lease, or the distribution of any services and any property,
tangible or intangible, real, personal or mixed, and any other article, commodity, or
thing of value in this state.

127.     Defendant offered the PSLF, IDR, and TEACH programs to Plaintiff Graham and

Class members representing to them that it would administer those programs in accordance with

Department of Education guidelines and Congress's intent of making higher education more

affordable for qualified borrowers, including Plaintiff Graham and the Class.

128.     Contrary to Defendant's representations during the Class Period, Defendant failed to

administer the PSLF, IDR, and TEACH programs according to Department of Education

guidelines and Congress' intent so that it could increase its profits.

129.    Specifically, Defendant failed to comply with DOE guidelines by, among other things: (a) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that status; (b) failing to process borrower applications for IDR plans, including REPAYE, within the necessary 15-day period; (c) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (d) failing to properly calculate borrowers' monthly payments under ALRPs at a level consistent with their income and family size; (e) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in TEACH grants being incorrectly converted into loans.

130.    Defendant's practices, as set forth above, involve trade or commerce because they present information regarding commercial services for the processing of applications and payments under several federal ALRPs. These practices are fraudulent or deceptive because Defendant represents that its services have benefits consistent with DOE guidelines, which it fails to provide.

131.    Plaintiff Graham and Class members relied on Defendant's misrepresentations regarding its practice of administrating the ALRPs in accordance with DOE guidelines.

132.    Additionally, Plaintiff Graham and Class members had no meaningful choice and were required to submit to Defendant's practices because Defendant was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff Graham and Class members were required to stay with Defendant even when it engaged in fraudulent or deceptive misconduct, for example, miscalculating their monthly loan payments under the IDR programs.

133.    Defendant's acts cost Plaintiff Graham and the Class ascertainable monetary losses in the form of increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Graham and Class members qualified for loan forgiveness, causing Plaintiff Graham and the Class to incur additional payment obligations before the end of their loan terms.

134.     Defendant thus failed to carry out these federal loan programs as advertised, creating a likelihood of confusion and misunderstanding in violation of the CUTPA.

135.     Plaintiff Graham and the Class have suffered harm as a result of Defendant's fraudulent or deceptive conduct, including having their access to debt relief and loan forgiveness delayed through the loss of qualifying payment months under ALRPs.

136.     Plaintiff Graham and the Class further seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Class will be irreparably harmed unless the unlawful actions of the Defendant are enjoined, as Defendant will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PSLF, TEACH grant and IDR programs. Absent injunctive relief, Defendant will continue to administer loans in a manner that harms consumers and directly conflicts their representations as serving the best interest of borrowers and the intent of Congress, in accordance with Department of Education guidelines, as detailed more fully herein

### THIRD CLAIM FOR RELIEF
#### (For Violation of New York General Business Law § 349)

137.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

138.     Plaintiff Burkle's injuries and those of the Class arise from Defendant's deceptive business practices as a commercial student-loan servicer.

139.     Plaintiff Burkle and Class members are consumers of Defendant's federal student loan services; their loans are serviced by Defendant and they applied through Defendant to take advantage of the PSLF, IDR, and TEACH programs that Defendant administers.

140.     As a consumer of Defendant's services, Plaintiff Burkle is authorized to bring a private action under New York General Business Law ("GBL") § 349(h).

141.    Defendant's student loan servicing business qualifies as "business," "trade," and "commerce" as defined by New York GBL § 349(a).

142.    Defendant offered the PSLF, IDR, and TEACH programs to Plaintiff Burkle and Class members representing to them that it would administer those programs in accordance with Department of Education guidelines and Congress's intent of making higher education more affordable for qualified borrowers like Plaintiff Burkle and the Class.

143.    Contrary to Defendant's representations during the Class Period, Defendant failed to administer the PSLF, IDR, and TEACH programs according to Department of Education guidelines and Congress' intent so that it could increase its profits.

144.    Specifically, Defendant failed to comply with DOE guidelines by, among other things: (a) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that status; (b) failing to process borrower applications for IDR plans, including REPAYE, within the necessary 15-day period; (c) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (d) failing to properly calculate borrowers' monthly payments under ALRPs at a level consistent with their income and family size; (e) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in TEACH grants being incorrectly converted into loans.

145.    Defendant's deceptive and unfair loan servicing practices had a broad impact on Plaintiff Burkle and all similarly situated federal student loan borrowers across the country.

146.    Defendant's practices, as set forth above, involve trade or commerce because they present information regarding commercial services for the processing of applications and payments under several federal ALRPs.

147.    Defendant's practices are materially misleading to a reasonable student loan borrower because Defendant represents that its services have benefits consistent with DOE

guidelines, which Defendant fails to provide. By failing to carry out its federal loan programs as advertised, Defendant created a likelihood of confusion and misunderstanding that affected the public in violation of GBL § 349.

148.    Defendant's misconduct, including Defendant's misrepresentations regarding its practice of administrating the ALRPs in accordance with DOE guidelines, directly caused Plaintiff Burkle and the Class pecuniary harm, including having their access to debt relief and loan forgiveness delayed through the loss of qualifying payment months under ALRPs.

149.    Additionally, Plaintiff Burkle and Class members had no meaningful choice and were required to submit to Defendant's practices because Defendant was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff Burkle and Class members were required to stay with Defendant even when it engaged in fraudulent or deceptive misconduct, for example, miscalculating their monthly loan payments under the REPAYE program or failing to correctly process timely loan payments

150.    Plaintiff Burkle and the Class further seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Class will be irreparably harmed unless the unlawful actions of the Defendant are enjoined, as Defendant will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PSLF, TEACH grant and IDR programs. Absent injunctive relief, Defendant will continue to administer loans in a manner that harms consumers and directly conflicts their representations as serving the best interest of borrowers and the intent of Congress, in accordance with Department of Education guidelines, as detailed more fully herein

## FOURTH CLAIM FOR RELIEF
### (For Breach of Contract)

151.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

152.    Defendant entered into a contract with the Department of Education on June 17, 2009 ("Contract").

153.    Under the terms of the Contract, Defendant is responsible for servicing the student loans incurred by the Class in return for payments from the federal government.

154.    Plaintiffs and the Class, as borrowers whose loans are serviced by Defendant, are the intended beneficiaries of the agreement between the Defendant and the Department of Education.

155.    Defendant materially breached the Contract when it engaged in the course of conduct intended to delay or otherwise fail to process applications under ALRP programs as described in Part III, *supra*. For example, the Contract provides:

> The servicer shall respond to written and email questions and requests timely and accurately. The servicer shall respond and resolve customer complaints; and create and execute a plan to escalate complaints to FSA and the Ombudsman.
> …
> Review and Reconciliation: Records are examined and reconciled to determine that transactions were properly processed and approved.

156.    Defendant's breach of the Contract damaged Plaintiffs and the Class, as more particularly alleged in Part III, *supra*.

## FIFTH CLAIM FOR RELIEF
### (For Unjust Enrichment)

157.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

158.    Defendant accepted millions of dollars in payments under the terms of its contract with the federal government to compensate it for administering ALRPs to Plaintiffs and the Class.

159.     Plaintiffs and the Class have conferred a benefit on Defendant in the form of extra, unnecessary payments of fees, interest, or other monies unearned and undeserved by Defendant.

160.     Plaintiffs and the Class have conferred a benefit on Defendant through their status as borrowers whose loans are serviced by PHEAA, which allows Defendant to collect a monthly amount for servicing these loans.

161.     Plaintiffs and the Class have conferred and continue to confer a benefit by acting as an instrumentality that allows Defendant to collect payments for servicing student loans.

162.     Defendant has been able to retain the benefits conferred by Plaintiffs and Class members by maintaining its current unlawful practices, as set forth above, and by retaining payments, fees, or other monies that Defendant did not lawfully or justly earn and does not deserve.

163.     Defendant failed to perform the services for which it was paid and has thus been unjustly enriched at Plaintiff's and Class members' expense.

164.     Because Defendant wrongfully obtained the benefit at the expense of Plaintiffs and Class members through unlawful and inequitable conduct, Defendant is obligated to disgorge back to Plaintiffs and Class members all amounts by which Defendant has been unjustly enriched.

## SIXTH CLAIM FOR RELIEF
### (For Fraud)

165.      Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

166.     As alleged herein, Defendant made material factual misrepresentations concerning its administration of the PSLF, IDR, and TEACH programs in accordance with DOE guidelines.

167.     Plaintiffs and the Class relied on Defendant's misstatements when they enrolled in ALRP programs serviced by PHEAA and made qualified payments in reliance on Defendant's misstatements.

168.     Defendant also made false representations to the Department of Education when it agreed to service ALRP loans in accordance with federal law and associated regulations, despite having no intention of changing its policy to comply with these laws. Defendant knew and intended that these misrepresentations would cause Plaintiffs and the Class to rely on them in enrolling in loan programs and submitting payments to PHEAA, enabling Defendant to continue receiving payments for servicing these loans.

169.     Defendant represented that it would properly administer the ALRP programs knowing or believing that those representations were false. Plaintiffs and the Class were justified in relying on Defendant's representations as a loan servicer selected by the Department of Education, and in many instances the only loan servicer authorized to carry out the relevant ALRP. Plaintiffs and the Class were injured as a result.

## SEVENTH CLAIM FOR RELIEF
### (For Constructive Fraud)

170.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

171.     Defendant, as a student loan servicer, has a confidential and/or fiduciary relationship with Plaintiffs and Class members. For example, Plaintiffs and members of the Class are required to furnish Defendant private, confidential information, including family status, income information, and tax information.

172.     Defendant represents to Plaintiffs, the Class, the public, and Congress that Defendant acts in the best interest of student loan borrowers, including providing them advice, information and other tools to "help" or assist them in choosing the "right" or "best" repayment plan for themselves in accordance with Defendant's contract with the Department of Education.

173.     As such, Defendant acts in a position of advisor or counselor and represents that it will act in good faith in the interests of Plaintiffs and the Class.

174.    Further, the relative position of the Defendant and student loan borrowers, including Plaintiffs and the Class, is such that Defendant has the power and means to take advantage of or exercise undue influence over Plaintiffs and Class members.

175.    For example, Plaintiffs and the Class were assigned to PHEAA to service and process their ALRPs, putting Defendant in a position where it could exploit Plaintiffs and Class members without any recourse.

176.    To increase its profits, Defendant exploited its relationship with Plaintiffs and the Class by making representations and engaging in misconduct that breached this confidential or fiduciary relationship. *See e.g.*, ¶ 118, above. As such, Defendant is operating in a way most beneficial to itself and in a manner directly opposite to the interests of Plaintiffs and Class members, despite holding itself out as acting in the best interest of the student loan borrower.

177.    Defendant's breach of its confidential or fiduciary relationship was the direct and proximate cause of the injuries suffered by Plaintiffs and the Class, including the extra fees, interest, and payments imposed upon them so that Defendant would receive additional monthly payments, interest subsidies and special allowance payments to which it would not otherwise be entitled.

## EIGHTH CLAIM FOR RELIEF
### (For Negligent Misrepresentation)

178.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

179.    Defendant, as Plaintiffs' and Class members' assigned student loan servicer, had a duty to accurately represents how it would be administer the ALRPs, including PSLF, IDR, and TEACH programs for which it was responsible.

180.    Rather than provide accurate information, Defendant, in the course of its business, profession or employment supplied false information to Plaintiffs and the Class, including through

monthly statements, emails, and its website, representing that it administers the ALRPs in accordance with DOE guidelines.

181.    Defendant knew or should have known at that time that it was not in compliance with DOE guidelines and that its pervasive and systematic failure to correctly process borrower applications, payments, and or otherwise administer the ALRPs under its responsibility, created obstacles to repayment.

182.    Plaintiffs and the Class justifiably relied on this false information (as Defendant intended) and, as a result, incurred extra fees, interest, and payments or otherwise has the duration of the loans extended.

183.    This unlawfully increased Defendant's revenue by resulting in additional monthly servicing payments, interest, subsidies, and special allowance payments that it would not be entitled to had it properly administered ALRPs to the Class.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A.    That the Court certify this lawsuit as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure, that Plaintiffs be designated as the Class representatives, and that Plaintiffs' counsel, *Lowey Dannenberg, P.C.*, be appointed as Class counsel;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate the Pennsylvania UTPCPL, 73 P.S. § 201-1 *et seq.*, Connecticut CUTPA, § 42-110a *et seq.*, and New York, GBL § 349 *et seq.*;

C.    That the Court award Plaintiffs and the Class damages for Defendant's violation of the Pennsylvania UTPCPL, 73 P.S. § 201-1 *et seq.*, Connecticut CUTPA, § 42-110a *et seq.*, and New York, GBL § 349 *et seq.*, including punitive damages and treble damages, as provide by law.

D.      That the Court issue an injunction restraining Defendant from continuing to engage in the fraudulent or deceptive trade practices alleged herein;

E.      That the unlawful conduct alleged herein be adjudged and decreed to violate the common law as alleged in counts four through eight, above;

F.      For a judgment awarding Plaintiffs and the Class damages, including punitive damages, for Defendant's violation of the common law;

G.      That the Court order Defendant to disgorge its ill-gotten gains for restitution to Plaintiffs and the Class;

H.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

I.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

J.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.


Dated:  White Plains, New York
        January 8, 2018

                                        **LOWEY DANNENBERG, P.C.**

                                        _____
                                        Peter D. St. Phillip (PA ID No. 70027)
                                        Christian Levis (*pro hac vice forthcoming*)
                                        Roland R. St. Louis, III (*pro hac vice forthcoming*)
                                        44 South Broadway, Suite 1100
                                        White Plains, New York 10601
                                        Tel.: 914-997-0500
                                        Fax: 914-997-0035
                                        pstphillip@lowey.com

clevis@lowey.com
rstlouis@lowey.com

Anthony M. Christina (PA ID No. 322528)
200 Barr Harbor Drive, Suite 400
West Conshohocken, Pennsylvania 19428
Tel.: 914-733-7268
Fax: 914-997-0035
achristina@lowey.com

*Counsel for Plaintiffs and the Proposed Class*